## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TENNESSEE, WESTERN DIVISION

|  |  |  |
|---|---|---|
| **RAYMOND JAMES & ASSOCIATES, INC.,** | ) | |
| **RAYMOND JAMES FINANCIAL, INC.,** | ) | |
| **and MORGAN KEEGAN & CO. LLC.** | ) | |
| **Plaintiffs,** | ) | |
|  | ) | |
| **v.** | ) | **No. _____** |
|  | ) | |
|  | ) | |
| **SAM NEVELS, TIM CURRAN, and** | ) | |
| **PIPER SANDLER & CO.,** | ) | |
|  | ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiffs, Raymond James & Associates, Inc. ("RJA"), Raymond James Financial, Inc. ("RJF"), and Morgan Keegan & Co. LLC ("Morgan Keegan") ("collectively, the "Plaintiffs") file this Complaint[1] against Defendants Sam Nevels ("Nevels"), Tim Curran ("Curran"), and Piper Sandler & Co. ("Piper"), (collectively, the "Defendants").

## **PARTIES**

1. RJA is a Florida corporation with its principal place of business located in St. Petersburg, Florida. RJA has offices in Memphis, Tennessee including one located at 1100 Ridgeway Loop Rd., Suite 600, Memphis, TN 38120.

---

[1] Contemporaneous with the filing of this Complaint, Plaintiffs are filing a Motion for Temporary Restraining Order/Preliminary Injunction and a Motion for Expedited Discovery.

2. RJF is a Florida corporation with its principal place of business located in St. Petersburg, Florida and is the parent holding company of RJA and Morgan Keegan. RJA and Morgan Keegan are both wholly owned subsidiaries of RJF.

3. Morgan Keegan is a Tennessee limited liability company with its sole member being RJF and with its principal place of business in St. Peterburg, Florida.

4. Piper is a Delaware corporation with its principal place of business located at 800 Nicollet Mall, Suite 900, Minneapolis, Minnesota. Piper has offices in Memphis, including one located at 3400 Players Club Parkway, Suite 150, Memphis, TN 38125.

5. Sam Nevels is a citizen of Tennessee and lives at 3617 Northwood Dr., Memphis, TN 38111.

6. Tim Curran is a citizen of Tennessee and lives at 1574 Exmoor Lane, Collierville, TN 38017.

## JURISDICTION AND VENUE

7. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs bring a federal claim pursuant to the federal Defend Trade Secrets Act, 18 U.S.C. § 1836.

8. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because they arise out of the same set of operative facts as the federal claim.

9. This Court has personal jurisdiction over the Defendants because, among other things, Nevels and Curran work and reside in Shelby County, Tennessee and Piper does business in Shelby County, Tennessee and many of the acts complained of occurred in Shelby County, Tennessee.

10. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because the causes of action arose in Shelby County, Tennessee, Nevels and Curran are residents of Shelby County, Tennessee, and Piper has a place of business in Shelby County, Tennessee.

## ARBITRATION

11. RJA, Nevels, Curran, and Piper are required to ultimately arbitrate this dispute before the Financial Industry Regulatory Authority ("FINRA"). Plaintiffs file this Complaint only to obtain temporary and preliminary injunctive relief, as permitted under FINRA Rule 13804. As required by this FINRA Rule, Plaintiffs are contemporaneously filing a Statement of Claim with FINRA, which seeks damages and permanent injunctive relief due to Defendants' wrongful actions alleged herein.

## INTRODUCTION

12. Effective September 5, 2023, Nevels and Curran (collectively the "Ex-Employees")—two long-time salespersons who worked together as partners in RJA's Fixed Income Division— resigned to go to work for Piper. RJA and Piper are direct competitors in the sale of fixed income securities to institutional clients such as banks and credit unions. While its investigation is on-going, RJA has determined:

- That the Ex-Employees looted RJA in the weeks before they left—taking over a thousand pages of confidential, proprietary and/or trade secret documents, including information relating to corporate opportunities, trading strategies, proprietary products, and detailed customer information and customer lists. The Ex-Employees accomplished this by, *inter alia*, using RJA's email system to send highly sensitive documents to their *personal* email addresses and by making photocopies straight from RJA's electronic systems.

- That Defendant Nevels—weeks before he resigned—told Piper about a lucrative new trading strategy RJA had developed regarding Bank Owned Life Insurance ("BOLI"). Piper is now using this strategy to compete against RJA.

3

- That Defendant Nevels deliberately sabotaged information in RJA's contact management system. Nevels did this by, *inter alia*, deleting the names and emails of his customer contacts at certain banks, replacing them with fictitious names and then inserting incorrect telephone numbers.

- That the Ex-Employees breached—and upon information and belief continue to breach—their post-employment commitments to RJA, including covenants: 1) not to take or use RJA's confidential and/or proprietary information, 2) not to compete, 3) not to contact, solicit or accept business from RJA's customers, and 4) not to attempt to induce RJA's employees to leave. Curran's post-employment covenants—which are more extensive than those of Nevels—likewise bind Nevels. Curran and Nevels are partners and Curran cannot do *indirectly* what he is prohibited from doing directly. As his partner, Nevels' acts directly benefit Curran and are attributable to Curran.

While the Ex-Employees are directly liable for their respective wrongdoing, so is their new employer, Piper, for direct misappropriation and for inducing the Ex-Employees' breaches of their covenants and duty of loyalty to RJA, as a co-conspirator, for aiding and abetting and for ratifying the Ex-Employees' acts, and upon the basis of respondeat superior.

In the face of repeated demands that all documents and information be returned, Defendants first obfuscated about their taking of documents. More recently, Defendants offered to return a *portion* of what was taken—but only if RJA effectively consented to the permanent deletion of the evidence demonstrating Defendants' theft and subsequent use—and refused to

promise no further use of the *information* the stolen documents contain or of trade secret information learned directly from the Ex-Employees. Incredibly, while RJA has demanded the return of its confidential, proprietary and/or trade secret documents continuously since September 5, 2023, not *a single page* has been returned.

Plaintiffs file this suit to obtain immediate injunctive relief to force Defendants to abide by the law, to return Plaintiffs' documents, to no longer use Plaintiffs' information, and to enforce their contractual and statutory rights to fair competition.

## FACTS

13. **The Plaintiffs.** RJA is a securities broker-dealer that services both retail and institutional customers across the United States.

14. This dispute involves the institutional side of RJA's fixed income business. The Fixed Income Institutional Sales Division (hereinafter referred to as "Fixed Income Sales") has a significant presence in Memphis due to RJF's 2012 purchase of Morgan Keegan which was a Memphis-based financial firm. Morgan Keegan's business and personnel were subsequently merged into RJA.

15. **The Ex-Employees.** Nevels and Curran have worked in Fixed Income Sales for over a decade. While they worked in Memphis, they sold bonds and other securities to banks and credit unions across the country. Until their recent resignations, Nevels and Curran had spent their *entire careers* as fixed income salespersons at RJA and, before the acquisition, Morgan Keegan. It was the training and on-going support they received that has allowed them to be successful.

16. **Nevels and Curran were not fixed income salespersons before coming to Morgan Keegan.** Nevels became a fixed-income salesperson sixteen (16) years ago when, in 2007, he was hired

by Morgan Keegan as a trainee. Nevels had no prior experience in the financial services industry, and therefore did not even have the necessary registrations to sell securities, which he studied and sat for at firm expense in 2007.

17. Curran previously worked in the securities industry and had brief stints at several firms, including at Sandler[2] in New York. This experience, however, was primarily on the equity side rather than in fixed income. Curran joined Morgan Keegan in 2006, where he continued his work in equity trading. In 2012, Curran lost his job when the equity division he worked in was largely eliminated due to Morgan Keegan's acquisition by RJF. Approximately a month later, however, Curran was rehired in a brand-new role—as a trainee for Fixed Income Sales.

18. **RJA provided the Ex-Employees the tools and support to be successful**. The job of a fixed income salesperson requires specialized knowledge and skills that neither of the Ex-Employees had when they started as trainees. Instead, they acquired this knowledge and these skills only through their work initially at Morgan Keegan and, after the acquisition, at RJA. In addition, as trainees and thereafter, the Ex-Employees received both extensive support and the tools that allowed them to become successful. This support and tools included:

    i.    Assigned Clients. As trainees and subsequently as salespersons, the Ex-Employees received their clients by assignment. These were various banks and other financial institutions across the United States who were either existing clients of the firm or, more likely, prospects that Nevels and Curran were expected to call on, develop relationships with, and learn about their needs. This frequently required travel (paid for by the firm for personal visits with a client-contact or to meet and entertain

---

[2] Sandler O'Neill was a securities broker dealer that provided investment banking services to institutional investors. Piper Jaffray Companies acquired Sandler O'Neill in 2020 and created "Piper Sandler & Co."—the named Defendant in this litigation.

client employees at industry conferences. Non-clients met at such events could be added to a salesperson's client roster with the management's approval.

ii.   <u>Client-related technology.</u> RJA provides salespersons with a contact management system called SimonPlus to manage and store client contact information, including the name of the client's contact person/decision maker, their phone numbers and email addresses, along with notes of interactions with the client. (*See* Declaration of Girish Lulla attached as **Exhibit 1**.) The salesperson can also make a client list so they can analyze their book of business as a whole. RJA also provides its salespeople with an analytical software called "eFolio" that allows the input of a bank- client's complete securities portfolio and other data. This provides the salesperson with enormous insight into the needs of the client and, among other things, allows modeling of the salesperson's suggestions regarding security purchases and sales.   In addition, RJA provides all of Fixed Income Sales with access to Bloomberg—a trading, communication and information platform that allows salespeople to track all of their transactions for a client or over a span of time.

iii.   <u>Specific Bond Suggestions.</u> RJA gives salespeople access to research produced by the firm's analysts who work with its specific "product desks."[3] Salespersons are thus able to find and quote bonds with the particular characteristics a client needs.

iv.   <u>Specialized strategies.</u> RJA also employs a team of fixed income strategists and other analysts who work with salespeople to devise solutions to a bank-client

---

[3] The product desks with a dedicated research analyst are the Municipal, Mortgage-Backed Securities, Corporate, and Structured Product desk.

problem that only indirectly involves a transaction for the salesperson. This might involve a proposal to re-position a bank-client out of direct credit card lending or to change its holdings in Bank Owned Life Insurance (BOLI). In both such situations, implementation of the strategy creates the possibility for very lucrative sales of securities for the bank as a by-product. Such strategies frequently can be replicated to appeal to a larger subsection of the market.

    v.    <u>Specialized Products</u>. RJA also gave institutional salespersons such as Nevels and Curran access to special products that only RJA sold. Examples of such are the underwritings RJA performs for reverse mortgage lender Finance of America. Because Finance of America buys and distributes each offering, these securities are typically available through RJA.

*See* Declaration of Calvin Sullivan, attached as **Exhibit 2**. These are but some examples of the extensive support and the confidential and proprietary tools that RJA provided to Nevels and Curran that allowed them to become and remain successful.

19. **Curran's and Nevels' partnership.** Nevels and Curran worked at RJA as partners/joint venturers (the "Partnership")—jointly servicing their assigned clients and sharing client revenues—working interchangeably in their assigned client relationships. (*See* Declaration of Calvin Sullivan, attached as **Exhibit 2**.) As partners/joint venturers, what benefited Nevels likewise benefited Curran, and vice versa. This partnership makes them legally responsible for each other's acts.

20. **Curran's and Nevels' income at RJA**. At the time of their resignation, Curran and Nevels had each been promoted to "Managing Director" and their Partnership serviced approximately

60 of RJA's institutional clients. Nevels and Curran were very well compensated at RJA. From 2019 through 2022, their collective take home pay was as follows:

- 2019—$██████
- 2020—$██████
- 2021—$██████
- 2022—$█████

*See* Declaration of Calvin Sullivan, attached as **Exhibit 2.** For YTD 2023, their combined income was approximately $█████. Upon information and belief, this was caused, at least in part, by the Ex-Employees intentionally delaying transactions so that the Ex-Employees could execute them at Piper after they left RJA and were employed by Piper.

21. Both Nevels and Curran signed several agreements that restrict their activities after they left RJA.

22. **Curran's Employment Agreement.** Curran entered a Financial Advisor Agreement (the "FA Agreement") on June 4, 2012 at or about the time he joined Fixed Income Sales as a trainee. (A copy is attached hereto as **Exhibit 3**). Specifically, the FA Agreement includes the following post-employment restrictive covenants:

     i. Restrictions on Curran's use of confidential, proprietary and/or trade secret information (the "Confidential/Proprietary Information Restrictions") (*Id.* at Section 5);

     ii. A 30-day non-compete that only prevented competitive work in the securities industry (the "Non-Compete Restriction") (*Id.* at Section 3(a));

     iii. A one-year prohibition on Curran directly or indirectly soliciting, contacting or accepting business from the clients that he serviced or became aware of

during his tenure at the firm (the "No Contact/Solicitation and Acceptance Restrictions") (*Id.* at Section 3(b)); and

    iv.   A one-year restriction on directly or indirectly soliciting firm employees (the "Employee Solicitation Restriction") (*Id.* at Section 4).

23. **Nevels' Confidentiality Agreement.** Nevels entered the "Agreement for Use of Electronic Technology" (hereinafter the "Electronic Confidentiality Agreement") on March 1, 2007 with RJA's predecessor and now sister company, Morgan Keegan. (A copy of the Electronic Confidentiality Agreement is attached as **Exhibit 4**.). Per its terms, Nevels agreed:

    i.   That all "Electronic Technology"—which specifically included firm-provided internet, e-mail, messaging and any related or similar technology presently or later available—is the sole property of the firm;

    ii.   That such information—which includes "intellectual property, business and/or trade secrets" of the firm— would only be used for legitimate firm-related purposes; and

    iii.   That such information would remain confidential and only accessed/used in a manner consistent with firm policies.

24. RJF bought Morgan Keegan in 2012 via an agreement whereby it purchased 100% of Morgan Keegan's stock. As a result, RJF stands in the shoes of Morgan Keegan for purposes of enforcing the Electronic Confidentiality Agreement. Moreover, following the acquisition, the operations of Morgan Keegan were merged into RJA.

25. **Piper's first recruitment of RJA's Fixed Income Sales employees in Memphis.** Sometime in early 2022, Piper began its recruitment of RJA's employees in Memphis Fixed Income Sales. On May 31, 2022, the first three RJA employees—Jake Pettit ("Pettit"), Joey

Vandergrift ("Vandergrift") and Kent Purcell ("Purcell") (collectively the "First Hires")—resigned to join Piper. Importantly, at least Vandergrift had an agreement with RJA that prohibited him from directly (or indirectly) recruiting or inducing RJA's employees to leave RJA and join Piper for one year. Upon information and belief, First Hires began soliciting RJA's employees shortly after their joint resignation.

26. **Piper's recruitment of Nevels and Curran.** Working through some or all of the First Hires and others, Piper began its recruitment of Nevels and Curran by no later than April of 2023—approximately 10 months after the First Hires joined Piper. This is illustrated by messages Nevels and Curran exchanged on April 11, 2023 on RJA's platforms stating: "Joey still wants to meet. You able to do that today?", to which Curran responded: "I can." (*See* April 11, 2023 Bloomberg messages between the Ex-Employees attached as **Exhibit 5**). Upon information and belief, the reference to "Joey" was Joey Vandergrift and the meeting referenced therein was one of many efforts by the First Hires to recruit Nevels and Curran to join Piper. A few days later, Nevels and Curran also reached out to an employee in RJA's Human Resources department to inquire if Nevels and Curran they had any agreements with the firm that required garden leave. (*See* April 14, 2023 emails between the Ex-Employees and Amy Adkins of RJA Human Resources attached as **Exhibit 6**).

27. While discovery will provide a more precise timeline, Piper's recruitment continued throughout the summer during which time the Ex-Employees began to quietly loot RJA of confidential, proprietary and/or trade secret documents regarding, *inter alia*, its clients, its trading strategies and other corporate opportunities. Nevels and Curran did this in at least two

ways.[4] First, Nevels and Curran—for the benefit of both themselves and Piper—sent dozens of RJA's confidential, proprietary and/or trade secret documents to their *personal* email accounts using their RJA-issued email. Many of these documents were emailed in the final few weeks of their employment, with the last of the emails occurring on September 1, 2023—the very day they gave RJA notice of their resignation. (*See* Declaration of Donald Smith attached as **Exhibit 7**.) Collectively, these documents total over one thousand (1,000) pages.

28. Second, Nevels and Curran—for the benefit of themselves and Piper—mass-printed documents in the months leading up to their resignations. RJA knows this because it maintains print logs that reflect each employee's printing from any of its platforms. (*See* Declaration of Marcus Cavil, with both Ex-Employees' prints logs attached, at **Exhibit 8**)   In just August— the last month of his employment—Curran printed 72 different documents totaling 541 pages, while his business partner, Nevels, printed 63 documents totaling 422 pages. (*Id.*) The file names of the majority of the August prints reflect the names of dozens of the clients Ex-Employees serviced for RJA. (*Id.*) At the same time, they spent significant time accessing client records in SimonPlus. (*Id.*; *see also* Declaration of Girish Lulla at para. 9, attached hereto as **Exhibit 1**). Upon information and belief, much of the printing captured by the print logs came straight out of RJA's SimonPlus contact management system and represented some or all of the data stored in it for most of the clients assigned to the Ex-Employees. Such information constituted RJA's confidential, proprietary and/or trade secret information.

---

[4] As mentioned above, RJA's investigation into the theft of its documents and information is still ongoing, and RJA reserves its right to bring forth additional facts and arguments as its investigation continues. Further, RJA believes that additional examples of misconduct will be found once its documents are returned, and it obtains discovery from the Defendants.

29. Curran and Nevels performed this—and their myriad other thefts—at least in part for the benefit of Piper and, upon information and belief, at its direction and/or with its prior knowledge. Alternatively, Piper has used and benefitted from the stolen information and documents and has therefore by its after-the-fact actions, approved and ratified the Ex-Employees' thefts and other breaches of duty to RJA. These acts violate the trade secret laws, the Ex-Employees' agreements, RJA's policies and procedures, the Ex-Employees duties of loyalty as well as other legal obligations. Piper is responsible for these acts both directly and based upon, *inter alia*, principals of respondeat superior.

30. Upon information and belief,[5] Nevels and Curran also traveled to Piper's fixed income offices in New York about a month before they resigned. During this trip, Nevels and/or Curran disclosed RJA's newly developed and proprietary BOLI bond trading strategy (the "BOLI-Bond Strategy") to Piper, doing so, upon information and belief, in order to ensure that they could enrich themselves with it once they joined Piper, as well as to curry favor with their soon-to-be new employer. This is apparent from internal messages between Nevels and Curran from August 9, 2023—just a few days after they returned from New York. In those message Curran states, "we should really dig into this BOLI idea Kevin n Bob getting real traction", to which Nevels responds in part "I agree…I asked specifically about this at the other place and they said they can do same thing." (*See* August 9, 2023 Bloomberg Conversation, attached as **Exhibit 10**.) Incredibly, Nevels and Curran expensed the cost of this trip to RJA.[6]

---

[5] RJA is aware of this because Nevels was exchanging messages with Daniel Sullivan, a Piper Fixed Income trader in its New York office, discussing an upcoming "3 day wknd" trip to New York in August. (*See* July 20, 2023's Bloomberg messages attached as **Exhibit 9**).

[6] The Ex-Employees appear to have submitted at least one other bogus travel expense—the costs of Curran attending an RJA-sponsored Bond School in Los Angeles two days before he tendered

31. **Curran's and Nevels' resignation.** On Friday, September 1, 2023, the Ex-Employees informed RJA that they were resigning, but stated that it would not be effective until Tuesday, September 5, 2023.[7] Interpreting this delay as an invitation to negotiate, RJA spent well over a week in an unsuccessful attempt to get Nevels and Curran to stay—all the time oblivious to their extensive breaches of loyalty and their illegal and malicious acts intended to improperly benefit them and Piper once they had left RJA.

32. **RJA learns of their Ex-Employees' misconduct.** Following weeks of investigation[8]—which only began in earnest after the Ex-Employees communicated their decision to stay at Piper— RJA discovered that the following types of documents and information were stolen by what they thought (and properly expected) were their loyal employees. The nature of these documents show that they were taken with the purposes of stealing RJA's corporate opportunities—both large and small—and stealing information that would allow the Ex-Employees to improperly compete for RJA's clients at Piper for their and Piper's benefit.

33. **Nevels and Curran took documents that would enable them to steal future RJA business opportunities.** Among other things, Nevels and Curran took documents that describe various corporate opportunities of RJA—opportunities that they learned of and were exposed to at RJA but which they now hope to capitalize upon at Piper. Some of these documents involve techniques or strategies of broad application, while others involve a particular trade or need of

---

his notice of his resignation. Given that this was on the very eve of his resignation, Curran had no legitimate RJA business purpose for attending. Upon information and belief, Curran used this RJA event to meet current and potential RJA clients for Piper's benefit.

[7] Monday, September 4, 2023 was Labor Day.

[8] While RJA's legal department technically began its privileged investigation on September 5, 2023, the investigation paused while management tried to convince the Ex-Employees to come back to the firm.

a specific bank. Large or small, each of the following are simply *examples* of the types of confidential, proprietary and/or trade secret information at issue.

a. **<u>Finance of America</u>**. On August 28, 2023—four days before he announced his resignation—Curran emailed himself the confidential disclosure documents relating to a Finance of America ("FOA") underwriting RJA recently handled for this long-time client. (*See* Declaration of Greg Sitrin attached as **Exhibit 11**.) FOA considers its underlying product—its reverse mortgages—confidential and even required RJA to enter a non-disclosure agreement ("NDA") to receive the information necessary to conduct the underwriting. (*Id.* at para. 5.) Curran's act of forwarding this information to himself is a direct violation of this NDA and could do serious harm to RJA's important relationship with this lucrative client—harm that would be very difficult to quantify. (*Id.* at para. 12.) In addition, the disclosure documents themselves could be used by a future competitor to reverse engineer RJA's proprietary techniques for addressing the challenges presented by the securitization of reverse mortgages. (*Id.* at para. 13.) Piper has little to no role in this market and RJA would be damaged by the entry of Piper as a competitor, an injury that would also be very difficult to quantify. (*Id.*) Curran well knew that the FOA disclosure documents were highly confidential. Indeed, the bank client he had previously sold the FOA securities to also had to sign an NDA to view the very disclosure documents Curran thereafter sent to himself. (*Id.* at para. 9.) One reason Curran knew of these confidentiality issues was that he was the person responsible for procuring the NDA this bank client. (*Id.*)

b. **Bank Owned Life Insurance (BOLI).**

    i.    Another corporate strategy that the Ex-Employees stole relates to Bank Owned Life Insurance ("BOLI"). BOLI is a hybrid insurance product that banks buy to generate tax-efficient income that also provides life insurance for certain of their employees. Many of RJA's bank clients own BOLI policies that are underperforming due to rising interest rates. Banks' bond investments have also decreased in value for the same reason, locking the banks into low-yielding securities that they do not want to sell at a loss. RJA—with the help of a contracted business partner—developed a proprietary approach—the BOLI-Bond Strategy—to address both these issues in a way that is both tax-efficient and has no impact on capital reserves. The transaction itself is also potentially lucrative for RJA because it would involve trading a large volume of securities, just one transaction can generate hundreds of thousands of dollars in revenue for RJA. This summer, a few employees within Fixed Income Sales perfected the approach and presented the BOLI-Bond Strategy for the first time to an RJA client on or about July 26, 2023.

    ii.    While Nevels and Curran physically sat in close proximity to the employees who developed the strategy—and therefore heard about it constantly and were even shown how to use it with the list of RJA clients that Nevels and Curran serviced—by all appearances they showed little interest at the time in the proprietary BOLI-Bond Strategy. RJA's investigation into the Ex-Employees' departure, however, tells a different story. As noted in paragraph 30, *supra*, the Ex-Employees saw the vast potential of the BOLI-Bond Strategy and told Piper

about it during their late July visit to Piper's offices in New York—literally within days of RJA's first use of the Boli-Bond Strategy. (*See* August 9, 2023 messages with the Ex-Employees attached as **Exhibit 10**.) The Ex-Employees subsequently secretly sent to their personal email addresses multiple confidential, proprietary and/or trade secret documents via their RJA email dealing with the Strategy, including:

1. a confidential internal RJA email generally describing the BOLI-Bond Strategy (*See* August 22, 2023 email from Nevels' work email to his personal email, attached as **Exhibit 12**);

2. a list of the RJA clients serviced by the Ex-Employees—sorted by RJA—that would benefit from using the BOLI-Bond Strategy, (*see* August 22, 2023 email with spreadsheet titled "Sam and Tim BOLI Prospecting," attached as **Exhibit 13**).

Thus, while they were acting disinterested at RJA, the Ex-Employees were in actuality disclosing RJA's confidential and proprietary BOLI-Bond Strategy to Piper before they even started their employment there.

iii. The threat of the Defendants stealing the BOLI-Bond Strategy and utilizing it at Piper is not simply a hypothetical concern. Within the last two weeks, an RJA Fixed Income salesperson in Texas offered the BOLI-Bond Strategy to one of RJA's clients only to be told that Piper had *already* presented the client with the same idea a few days before. (*See* Declaration of Bill Nowlin attached as **Exhibit 14**.) The client declined to consider using RJA to implement and execute the BOLI-Bond Strategy soley because Piper had brought the idea to it

17

first. (*Id.*) RJA thus not only lost the opportunity for that lucrative transaction but its salesperson's standing with this client likely has been permanently damaged. (*Id.*, at para. 6). RJA has been and will continue to be harmed—and harmed irreparably—by the Defendants' use of the BOLI-Bond Strategy they stole from RJA.

c.   ███████████████████ ("██████"). In mid-June 2023, Curran—with the help of others from RJA's salesforce—presented an opportunity to ██████, one of the RJA's clients serviced by the Ex-Employees. (*See* June 17, 2023 email with attachments Curran forwarded to his personal email, attached as **Exhibit 15**.) The presentation involved how ██████ could increase its profit by several million dollars by hiring a third-party provider to run its credit card operations. (*Id.*) Such a move would also benefit RJA because, as part of the process, ██████ would sell its existing credit card receivables through RJA. To assist in this presentation, the Ex-Employees worked with ██████ to get certain client-specific data which was memorialized into a report which the Ex-Employees provided to ██████ by email on June 17, 2023. (*Id.*) Simultaneously with providing this report to ██████, Curran also forwarded the underlying email and attachments from his RJA issued email to his *personal email*. (*Id.*) Upon information and belief, ██████ had not accepted this credit card strategy prior to the Ex-Employees' resignations. With the benefit of this information, the Ex-Employees—for the benefit of themselves and Piper—can now, among other things, present a similar strategy to ██████ or use it with other similarly situated clients at Piper.

While the first theft of information was carried out by Curran in June, the hope of taking ██████ business to Piper was still top of mind at the time the Ex-Employees

resigned. On August 28, 2023—four days before they gave notice of their resignation—Curran forwarded two additional emails from his RJA issued email to his *personal* email address related to ███████. (*See* August 28th emails with attachments, collectively attached as **Exhibit 16**). These emails contained information about potential securities ███████ was interested in—including the type of security and its pricing and maturity dates. The theft of this client information, coupled with the credit card strategy mentioned above, allows Curran, Nevels and Piper to improperly use RJA's confidential, proprietary and/or trade secret information to steal RJA's business opportunities.

d.  ██████████████████████**.** On August 30, 2023—two days before giving notice of resignation—Nevels sent himself two emails about the interest a particular client—██████████████████ ("████████████")—had in a particular security. (*See* August 30, 2023 emails for ██████████████, attached as **Exhibit 17**.) Within these emails, Nevels and ██████████████ go back and forth about the specific needs of the client for the trade. No such trade was placed for ██████████████ before the Ex-Employees resigned. By stealing this confidential and/or trade secret information, Nevels, Curran—and now Piper—can easily pursue ██████████████ with clear knowledge of the bank's needs and of its competitor's (i.e., RJA's) last offering, potentially robbing RJA of this business opportunity.

e.  ██████████████**.** A final example of the Ex-Employees' theft of a potential opportunity occurred when the Ex-Employees attended an industry conference in Boston—with RJA again paying their expenses—just a couple weeks before they gave their notice of resignation. The following week, a client representative of the ██████████████ reached

out to the Ex-Employees saying it was good to connect at the Boston conference and then went on to ask for due diligence information that RJA "would offer to a new bank client." Nevels immediately forwarded this email including the relevant contact information to his and Curran's personal email addresses. (*See* August 25, 2023 email attached as **Exhibit 18**.) Upon information and belief, the Ex-Employees never sent RJA's information to this potential client nor connected anyone at RJA with the client before resigning a week later, thus robbing RJA of this potential business opportunity.

34. **Nevels and Curran took documents that would enable them to service their former RJA clients.** The Ex-Employees, again for their and Piper's benefit, stole reams of detailed customer information designed to enable them to unfairly compete for and continue to serve at Piper the RJA clients they previously served at RJA. Examples of this include:

A. **Historic Trade Run.** On August 25, 2023 (a week before he resigned), Curran sent two spreadsheets from his RJA email to his personal email. (*See* August 25, 2023 email with both spreadsheets included, attached as **Exhibit 19**.) The first spreadsheet—entitled "Trade History – Tim Curran"—appears to contain every single trade Curran made for the RJA clients he and Nevels serviced from 2012 forward. (*Id.*) This spreadsheet is over **2,900 rows** long and contains the RJA client name, the trade date, if the trade was a purchase or a sale, the quantity of the security bought or sold, a brief description, the price and the commission. (*Id.*) The other spreadsheet is titled "July 2022 Account List" and contains over 200 rows of RJA client data, including the name of the institution, the name of the contact person(s), email addresses, the type of products the institution purchases and if it is a credit union or a depository institution. (*Id.*) This valuable information is confidential and not publicly available and will

benefit the Ex-Employees in understanding the historical preferences and strategies of the RJA clients they serviced.

B. **Account Prospect List.** On June 30, 2023 (two months before he resigned), Nevels sent a spreadsheet from his RJA email to his personal email titled "Account List Open Prospect" which contains the name of 81 different institutional clients, the city and state they are located, and if the client was a current or prospective client of RJA. (*See* June 30, 2023 email with the spreadsheet attached as **Exhibit 20**.) Amazingly, Nevels even included an additional column titled "PS Status," which upon information and belief, stands for "Piper Sandler Status." Nevels was thus already scheming which clients he could poach two months before he resigned. Nevels went on to send an updated copy of this spreadsheet with different and/or additional clients from his RJA email to his personal email on July 30, 2023.

C. **SimonPlus Contact List.** On August 2, 2023 (a month before he resigned), Nevels sent a spreadsheet from his RJA email to his personal email titled "Contacts" which is exported directly from RJA's contact management system, SimonPlus. (*See* August 2, 2023 email with the accompanying spreadsheet attached as **Exhibit 21**; *see also* Declaration of Girish Lulla attached as **Exhibit 1** at para. 10.) This spreadsheet contains 470 rows of RJA's client names along with their email addresses and phone numbers. (*Id.*)

D. **Christmas List.** On September 1, 2023 (the day that the Ex-Employees gave notice of their resignation), Curran emailed himself a spreadsheet titled "Christmas List" which contains the name of the institutional client, the contact name(s) and physical address

21

for 144 of RJA's clients. (*See* September 1, 2023 email with the accompanying spreadsheet attached as **Exhibit 22**.)

Coupled with all the other confidential, proprietary and trade secret information that was stolen, these compilations of RJA client contact information will immeasurably assist Defendants as they attempt to steal RJA's clients.

35. **Nevels' sabotage of RJA's client information in SimonPlus—RJA's client management system.** As noted above, RJA's Fixed Income Sales uses a contact management system called SimonPlus to manage, service, and keep track of its clients. It allows RJA's salesforce to store clients' contact and financial information, notes of their interactions with and the needs of clients, and store client related documents. The compilation of information contained therein is highly confidential, proprietary, and/or constitutes a trade secret.

36. In the days prior to his resignation, Nevels tampered with data for at least four different clients in SimonPlus. In these instances, Nevels did one or more things to disadvantage and harm RJA, including: a) completely changing the name of the client contact from an actual person to a fictious name; and/or b) deleting the title, email address and phone number for the client contact; and/or c) altering the phone number by one digit for the client to render the number meaningless for the RJA employee that would rely upon that information after their resignation. (*See* Declaration of Karah Bartlett, attached as **Exhibit 23**.) Nevels did so with the obvious intent to impede RJA's ability to contact and service its own clients.

37. **Piper unquestionably knew of the Ex-Employees restrictions on the same day they were hired.** On September 5, 2023—the date the Ex-Employees officially began work at Piper—Counsel for RJA forwarded Piper a copy of Curran's FA Agreement along with a letter that stated in relevant part,

> RJA wants to ensure that Piper is aware of the covenants signed by Mr. Curran that prevent him from, among other things, immediately working for Piper, as well as contacting, soliciting, or accepting business from any client he serviced at RJA. Because this no-contact, no-solicitation and no-acceptance covenant applies with equal force to indirect actions, RJA expects Mr. Curran's partner, Mr. Nevels, to likewise refrain from all such prohibited conduct. In addition, we likewise expect Piper (and its agents) to refrain from inducing Mr. Curran's breach of his covenants or otherwise aiding and abetting any violation of them moving forward.
>
> ….
>
> Given that nothing was returned to RJA at the time of their resignations, we have serious concerns that Mr. Curran and/or Mr. Nevels have taken RJA's confidential, proprietary, and/or trade secret information, including customer-related information. Demand is hereby made for the immediate return of any and all such RJA information in the possession, custody or control of Messrs. Curran and Nevels, as well as any already held by Piper, itself.

(*See* Letter of September 5, 2023, from N. Prosser, to Piper, attached as **Exhibit 24**). Despite this letter and notice of the restrictions, Piper continued to employ the Ex-Employees and did not return any documents they stole from RJA.

38. On September 15, 2023—having received no response from Piper—Counsel for RJA sent Cease and Desist letters to both Ex-Employees. (*See* Letters of September 15, 2023 from N. Prosser to Curran and Nevels, respectively, attached as **Exhibits 25** and **26**). Among other things, these letters asked that the Ex-Employees either "*affirm*" or "*return*"—i.e., that they either affirm that had not taken RJA's confidential information, or if they had, that they make arrangements for its immediate return by the following business day, September 18, 2023.[9]

---

[9] Specifically, the letter to Curran stated as follows:

> While RJA's investigation is still ongoing, we already have serious concerns that you/or your partner, Mr. Nevels, have taken RJA's confidential and/or trade secret information, including customer related information. Demand is hereby made for the immediate

The letters also demanded both partners comply with Curran's non-compete and asked for affirmations—also by Monday, September 18, 2023—that both Ex-Employees would comply with Curran's customer and employee non-solicitation agreements. (*See* Letter of September 15, 2023 from N. Prosser to Curran at pp. 2-3; *see also* Letter of September 15, 2023 from N. Prosser to Nevels at p. 2, **Exhibits 25** and **26**, respectively).

39. On September 18, 2023, Piper, Nevels and Curran responded via a letter from their joint counsel. (*See* Letter of September 18, 2023 from P. McElligott to N. Prosser, attached hereto as **Exhibit 27**.) While this response met RJA's deadline, it contained *none* of the requested affirmations. Tellingly, it did not even deny that the Ex-Employees had stolen documents and information. Rather—playing a game of catch-me-if-you-can—Defendants challenged RJA to first provide a detailed description of everything taken, at which point Piper would then "investigate and inquire whether there was anything improper." (*Id*. at pg. 2). Curran and Nevels obviously knew what they had taken, as did—upon information and belief—Piper itself. Moreover, Curran's and Nevels' thefts would have been apparent to Piper with even the most basic of investigations—e.g., from a simple interview of them or a review of their devices.[10]

---

return of any and all confidential and/or trade secret information of RJA in the possession, custody or control of you, Mr. Curran, and/or Piper. We ask by close of business **Monday September 18, 2023**, that you **either:** a) **affirm** that you took no documents or things containing confidential, proprietary, and/or trade secret information of RJA, or b) make arrangements with me to **return** any such documents and things that were taken.

(*Id.* at p. 5 of **Exhibit 25**.)

[10] Defendants' September 18, 2023, letter also partially addressed RJA's demand that the Ex-Employees fully comply with Curran's covenants. As to Curran's non-compete, the Defendants'

40. RJA sent two additional letters to the Defendants—one on September 22, 2023[11] and the other on September 26, 2023.[12] The first of these letters noted the Ex-Employees failure to affirm or return—specifically highlighting their failure to affirm that they "took no documents or things containing confidential, proprietary, and/or secret information of RJA" or to make arrangements "to return any such documents and things that were taken."(*See* **Exhibit 28**, p. 2). It went on to demand that any such documents both be returned immediately and "scrubbed to RJA's satisfaction from Your Client's devices/platforms." (*Id.*, at p. 4). The letter from RJA's counsel on September 26, 2023 went much further. After providing a chart of six (6) highly sensitive documents Nevels and Curran had stolen from RJA via email, RJA demanded that Defendants make no further use of RJA's information and act immediately to prevent further harm from their theft, as follows:

> The only reason to have removed this information is to allow Nevels, Curran and Piper to unfairly compete against RJA—using RJA's own information against it to do so. RJA hereby demands that the Potential Defendants make no further use of RJA's confidential, proprietary and/or trade secret information, that they turn over all documents/information—whether hard-copy or electronic—that contains such information, and they scrub their systems and devices of same in a manner satisfactory to RJA. Only by faithful adherence to these demands can the Potential Defendants begin to mitigate the

---

letter stated that Curran was now, in fact, in compliance by virtue of his termination by Piper. Upon inspection, however, this maneuver was merely for show. His termination had only occurred that day—13 days into Curran's 30 day non-compete period—Curran was to be re-hired in two weeks after the remainder of the original term expired, and most importantly, Nevels disclaimed any obligation to comply by virtue of being Curran's partner, meaning he felt free to contact and service their joint clients in Curran's absence. (*See* **Exhibit 27**, at pp. 1-2). Defendants' letter gave no indication that either of the Ex-Employees would comply with Curran's promise not to contact, solicit, or accept business from the clients they had formerly serviced at RJA.

[11] *See* Letter of September 22, 2023, from N. Prosser to P. McElligott, (attached hereto as **Exhibit 28**).

[12] *See* Letter of September 26, 2023, from N. Prosser to P. McElligott, (attached hereto as **Exhibit 29**).

harm they have already caused and to avoid further, very substantial harm occurring in the future.

To implement this mitigation strategy, the Potential Defendants must:

1.      Agree in a signed writing—to be received by close of business Thursday September 28, 2023—to make no *further use* of RJA's confidential, proprietary and/or trade secret information, including making no use of RJA's *BOLI trading strategy* or its *customer information*.

2.      Provide—by close of business Thursday September 28, 2023—all hard copy documents containing RJA's confidential, proprietary and/or trade secret information—whether taken from RJA or created in whole or part from such information.

3.      Provide—by close of business Thursday September 28, 2023—an inventory of each electronic device (personal, work or otherwise), including all phones, tablets, laptops and/or cameras, as well as each email address, utilized by Curran and/or Nevels from January 1, 2023 forward.

4.      Provide an inventory of what documents and information were transmitted to Piper's systems/platforms, physically brought to the Piper's facilities, and created using RJA's documents and information by close of business Friday, September 29, 2023.

5.      Make arrangements satisfactory to RJA for the forensic imaging of each of Nevels' and Curran's electronic devices for the inspection by representatives of RJA by close of business Friday, September 29, 2023.

6.      Make arrangements satisfactory to RJA for the segregation and removal from Piper's systems/platforms and Curran's and Nevels' electronic devices all RJA documents or information taken by Nevels, Curran, or anyone acting in concert with one or both of them by close of business Friday, September 29, 2023.

*See* Letter of September 26, 2023, from N. Prosser to P. McElligott, (attached hereto as **Exhibit 29**).

41. On September 28, 2023, Defendants, through their joint counsel, responded to RJA's letter of September 26, 2023. (*See* Letter of September 28, 2023, from P. McElligott to N Prosser,

attached as **Exhibit 30**). While Defendants continued to feign ignorance about any stolen documents (they were "not advised by anyone at Raymond James that there was anything else to return"), the letter immediately proceeded to implicitly acknowledge their theft ("my clients do not need it and will voluntarily return it"). (*Id.* at p. 3.) Most importantly, Defendants ignore most of the protections RJA had demanded and artfully dodged the others. They did not provide an inventory of the devices they used to steal RJA's information, (as sought in No.3, above); they did not provide an inventory of what stolen information was transmitted to Piper's systems/platforms, (as sought in No. 4, above); they did not agree to image Nevels' and Curran's personal devices, (as sought in No. 5, above); and they did not address the segregation and removal of the stolen information from Piper's systems, (as sought in No. 6, above). (*Compare* September 26th letter attached as **Exhibit 29**, at p. 3, with the September 28th letter attached as **Exhibit 30**, p. 3).

42. Moreover, Defendants nowhere agreed to refrain from "*further use*" of RJA's stolen information, as demanded in request No.1, above. Instead, they proposed only to "return/scrub any information *they* [Nevels and Curran] have from their time at Raymond James." (*See* **Exhibit 30** at p. 3). This obviously does not address information in *Piper's possession or on its systems*, nor their and Piper's *use* of the information gleaned from the documents they stole or which was otherwise communicated by the Ex-Employees—e.g. the BOLI-Bond Strategy. This already inadequate proposal is further expressly conditioned on RJA's agreement that it will not object to Defendants to "permanently deleting the above referenced information." (*Id.*)

43. Defendants thus offered to return a *portion* of the documents they stole—so long as they could permanently erase all evidence of what was taken and how it was used—while simultaneously leaving RJA to trust that even this was done. Needless to say, RJA rejected this approach since

it would have enabled the Defendants to erase the full extent of their unlawful conduct without ever disclosing it to Plaintiffs. To date Defendants continue to hold *all* of RJA's stolen documents and information, which upon information and belief, they continue to use to compete against RJA.

44. **RJA's reasonable and appropriate measures to protect its confidential, proprietary, and trade secret information.**   RJA's trade secrets are not generally known or readily ascertainable by proper means, and RJA derives a significant economic and competitive advantage in the institutional fixed income and securities business by maintaining the security and confidentiality of its trade secrets. (*See* Declaration of Calvin Sullivan, attached as **Exhibit 2**). RJA invests substantial time, money, and resources to develop its confidential, proprietary and trade secret information and, accordingly, takes reasonable and appropriate measures to maintain their secrecy. (*Id.*) Some of these measures include RJA requiring its employees to promise and reaffirm annually that they will protect its confidential, proprietary, and/or trade secret information. Curran and Nevels were no exception, contractually obligating themselves to follow RJA's policies and procedures.  In completing RJA's annual ethics training in 2022, both Curran and Nevels agreed to abide by, *inter alia*, the firm's Associate Handbook which contained the following:





d. 

(*See* 2022 Ethics Training Completion Records for Curran and Nevels and excerpts from the 2022 Ethics Module and 2022 Associate Handbook, attached as Collective **Exhibit 31**.)

45. Likewise, the June 2023 Associate Handbook which was attested to via annual compliance questionnaires[13] states:



…

(*See* excerpts from RJA's 2023 Associate Handbook, attached as **Exhibit 32**; *see also* the RJA's Information Technology Acceptable Use Policy attached as **Exhibit 34**.)

---

[13] (*See e.g.* Curran's 2023 Fixed Income Annual Compliance Questionnaire, attached as **Exhibit 33**.)

46. RJA specifically spells out therein what employees must do to protect this information:

> To maintain the confidentiality of company confidential information, all Associates must follow these protocols:
>
> ....



> ....

(*Id.*)

47. RJA also protects its confidential, proprietary, and/or trade secret information via other measures which include, *inter alia*, (i) employee policies specific to the use of electronic information which tell RJA's employees that confidential information is not to be improperly accessed/used and the confidentiality of such is to be maintained, (ii) the use of a password to access RJA's systems and information, (iii) encryption requirements for transmitting sensitive information, (iv) mechanical safeguards to prevent the removal of information via removable media (e.g. CDs and USB drives); and (v) prohibitions on the use of personal email accounts to send or receive anything involving RJA's business. (*See* Declaration of Calvin Sullivan, attached as **Exhibit 2).**

48. **Curran and Nevels' violation of the No Contact/Solicitation and Acceptance Restrictions**.

Per their agreements, Curran (and Nevels indirectly as his business partner) cannot contact,

solicit or accept business from clients they serviced at RJA or learned of while employed at RJA.

49. The amount of RJA client-related and client-specific confidential, proprietary and/or trade secret information that the Ex-Employees stole, in conjunction with their repeated refusal to affirm their intent to adhere to the covenant, coupled with the denial by Nevels of any intention to adhere,[14] is clear evidence of the Ex-Employees' violation of the No Contact/Solicitation and Acceptance Restrictions.

50. **Nevels' and Curran's improper contact with RJA's Fixed Income Sales staff**. Upon information and belief, since terminating their employment with RJA, Nevels and Curran have attempted to solicit or otherwise induce other RJA employees to terminate their employment with RJA in blatant violation of Curran's employee non-solicitation agreement.

51. **The harm caused by the Defendants' unlawful conduct**. The bad acts discussed above (and likely many more that discovery will uncover) have violated a plethora of legal obligations that the Defendants owe RJA. Due to the confidential, proprietary and/or trade secret documents and information at issue, it is impossible to put a value on the damage that RJA incurred as well as the damage it will incur due to these bad acts. This damage includes, at a minimum, the loss of goodwill that RJA has with its clients, the loss of goodwill among its salesforce, the impact on RJA's business relationships, the loss and impairment of business opportunities and the loss of RJA's ability to fairly compete on a level playing field. (*See* Declaration of Calvin Sullivan, attached as **Exhibit 2**). Consequently, Nevels' and Curran's breach of the other

---

[14] (*See* Letter of September 18, 2023 from P. McElligott to N. Prosser, attached hereto as **Exhibit 27** at p. 1.)

contractual obligations and Defendants' theft of RJA's proprietary, confidential, and/or trade secret information has caused irreparable harm to RJA.

52. The breadth of this irreparable harm, caused by Defendants' obviously intentional bad acts, provides ample justification for the immediate injunctive relief sought by RJA.

## **CAUSES OF ACTION**

### **Count I—Breach of Contract against Curran and Nevels.**

53. Plaintiffs hereby incorporate by reference the allegations set forth in the preceding sections of this Complaint as if fully restated herein.

54. In exchange for, *inter alia*, employment with RJA, Curran agreed to a number of post-employment restrictions, including the Confidential/Proprietary Information Restrictions that required Curran to use RJA's confidential and proprietary information only for RJA's benefit, not disclose it or remove it without proper authorization, and return said information upon his termination from RJA. The Confidentiality/Proprietary Information Restrictions read as follows,

> You acknowledge that you are and/or have been in possession of Confidential and Proprietary Information consisting of: customer statements, customer holdings and other financial data regarding Raymond James [ ] customers; customer lists; prospect lists; sample presentations; sample marketing booklets and memoranda; sales strategies, methods and proposals; business methodology and implementation plans; securities research materials; portfolio/performance analyses; correspondence and other written and computer accessible materials utilized or to be utilized by Raymond James [ ] in the conduct of its securities business.
>
> > a) You agree to use such Confidential and Proprietary Information only in the proper course of conducting business for and on behalf of Raymond James [ ] and, unless expressly permitted by Raymond James [ ], you

shall not disclose any Confidential and Proprietary Information to any third party at any time during or after your employment with Raymond James [ ]. Unless expressly permitted by Raymond James [ ], you shall neither make nor cause to made copies of confidential and proprietary Information from Raymond James [ ] business premises, except in the loyal performance of your duties as an employee of Raymond James [ ].

b) You agree to return to Raymond James [ ] either before or immediately upon your termination of employment with Raymond James [ ] any and all written information, materials, or equipment that constitute or contain Confidential and Proprietary Information, including any and all copies thereof (whether maintained in paper form, electronically, on computer disc, on magnetic disc or tape by any other means). You also agree to return to Raymond James [ ] at such time any other documents or materials relating to Raymond James [ ] business which are or may be Raymond James [ ] property, whether confidential or not.

(*See* FA Agreement pp. 2-3, **Exhibit 3**.)

55. Curran and Nevels were partners who worked on RJA clients jointly and shared in the compensation generated by each client. Upon information and belief, Curran and Nevels are partners at Piper and will continue to share a book of business and split the revenues derived therefrom.

56. As such, Nevels is prohibited from doing what Curran cannot do under the FA Agreement. Curran cannot have Nevels do what he is prohibited from and then enjoy the benefits thereof. Thus, for example, Nevels cannot solicit, contact, or accept business from the clients the partners jointly serviced at RJA since such acts would directly benefit Curran.

57. In addition to the FA Agreement, Nevels has his own direct contractual agreements with the Plaintiffs, including the Electronic Confidentiality Agreement in which he agreed that all

Electronic Technology (e.g. firm provided internet, e-mail, and any related or similar technology presently or later available) constitutes the Plaintiffs' "intellectual property, business and trade secrets," including "all personal, professional or confidential information or data, financial or otherwise, related to [the firm's] business, its employees, its clients or prospective clients." Nevels further agreed therein that,

> ET is the property of Morgan Keegan and may be accessed or used for legitimate business purposes only. ET should not be accessed or used for personal matters unrelated to legitimate Morgan Keegan business purposes
>
> ET constitutes intellectual property, business and trade secrets of Morgan Keegan, which includes, without limitation, any and all personal, professional or confidential information or data, financial or otherwise, relating to Morgan Keegan's business, its employees, its clients or prospective clients, whether prepared, viewed, received or delivered by the undersigned or by anyone else, and is the sole property of Morgan Keegan. All ET will remain confidential as required by securities industry laws, rules and regulations, or as otherwise required, absent written authorization from Morgan Keegan, its clients, prospective clients, or as otherwise authorized or required by other lawful authority;

(*See* 2007 Agreement for Use of Electronic Technology (the "Electronic Confidentiality Agreement") at ¶¶ 1-2 attached as **Exhibit 4**.)

58. Because RJF purchased 100% of the stock of Morgan Keegan, RJF stands in the shoes of Morgan Keegan and can and hereby does sue to enforce Nevels' obligations under the Electronic Confidentiality Agreement and for breach of that agreement. In the alternative, to the extent the right to so enforce the Electronic Confidentiality Agreement rests with Morgan Keegan or with RJA, Morgan Keegan and/or RJA, respectively as the case may be, hereby brings those claims.

59. Curran and Nevels also contractually obligated themselves to protect and not misuse/disclose RJA's confidential, proprietary, and/or trade secret information via, *inter alia*, their annual

34

compliance attestations and ethics training modules in which they agreed to specific language therein that they would abide by RJA's policies, including its Associate Handbook (*see e.g* the "Handbook Confidentiality Agreements").

60. In violation of the Confidentiality/Proprietary Information Restrictions in the FA Agreement, the Electronic Confidentiality Agreement, and the Handbook Confidentiality Agreements, Curran and Nevels have removed, used, and/or disclosed to Piper Plaintiffs' confidential and proprietary information. Moreover, Defendants have failed to return to RJA the confidential and proprietary information taken by the Ex-Employees despite acknowledging that it is in their possession, custody or control and despite repeated requests by RJA.

61. Curran also agreed in the FA Agreement to the Non-Compete Restriction, which prevents competitive work in the securities industry for 30 days following his termination from RJA, and reads as follows,

> for a period of thirty (30) days following the termination of your employment with Raymond James … you will not become employed by, affiliated with, provide consulting or assistance of any kind to, any securities broker or dealer or bank securities dealer which is engaged in the United States in the business of selling securities of any kind or nature to institutional, retail or wholesale customers.

(*See* FA Agreement, **Exhibit 3**, p. 1.)

62. Piper is a securities broker/dealer based in the United States engaged in the business of selling securities to institutional clients and thus clearly qualifies as one of the employers that Curran was prohibited from working for during the 30-day period following his September 5th resignation from RJA.

63. In violation of the Non-Compete Restriction, Curran immediately commenced employment with Piper on the effective date of his termination and upon information and belief continued to provide assistance to Piper even after he was temporarily "terminated."

64. Curran also agreed in the No Contact/Solicitation and Acceptance Restrictions to a twelve-month restriction on the solicitation, contact, and acceptance of business from certain RJA clients. This Restriction reads as follows,

> for a period of twelve (12) months following the termination of your employment with Raymond James [ ], whether such termination be voluntary or involuntary, and regardless of whether the termination is with or without cause,
>
> i. You will not directly or indirectly contact or solicit for the buying, selling or ownership of securities those persons, companies, firms, entities, funds or corporations whose accounts you serviced while employed with Raymond James [ ], who you contacted or solicited while employed with Raymond James [ ], or whose identities you became aware of while employed with Raymond James [ ];
>
> ii. You will not directly or indirectly accept securities business from those persons, companies, firms, entities, funds, or corporations whose accounts you serviced while employed with Raymond James [ ], who you contacted or solicited while employed with Raymond James [ ], or whose identities you become aware of while employed with Raymond James [ ]; and
>
> iii. You will not directly or indirectly assist another person, firm, or company in soliciting securities business from those persons, companies, firms, entities, funds, or corporations whose accounts you serviced while employed with Raymond James [ ], who you contacted or solicited while employed with Raymond James [ ], or whose identities you become aware of while employed with Raymond [ ].

(*See* FA Agreement, p. 2, **Exhibit 3**.)

65. Upon information and belief, both Curran and Nevels, working in concert or for each other's benefit, have breached the FA Agreement by soliciting, contacting, and/or accepting business

from clients they serviced and prospects they learned of while at RJA. Moreover, Defendants have refused to provide RJA assurances that Curran would refrain from all such actions while Defendants have taken the position that Nevels may solicit, contact, and accept business from their joint clients.

66. Curran also agreed in the Employee Non-Solicitation Restriction that for twelve months after his termination he would neither directly (nor indirectly by assisting others) solicit or induce any RJA employee to quit. The Confidentiality/Proprietary Information Restrictions reads as follows,

> for a period of twelve (12) months following the termination of your employment with Raymond James … you will not … directly or indirectly induce such person to leave his or her employment with Raymond James [ ], nor shall you directly or indirectly assist a third party in inducing any employee of Raymond James [ ] to leave his or her position with Raymond James [ ].

(*See* FA Agreement, p. 2, **Exhibit 3**.)

67. In violation of the Employee Solicitation Restrictions, Curran and Nevels, upon information and belief, have been directly or indirectly assisting Piper with its further recruiting efforts of RJA's fixed income salesforce and will continue to do so.

68. The post-employment restrictions agreed to by Curran and Nevels are reasonable and necessary to protect the legitimate business interests of Plaintiffs including, but not limited to, substantial investments in the Ex-Employees, employee and customer relationships, goodwill with clients and confidential and proprietary information utilized in maintaining customer relationships and generating business.

69. The post-employment restrictions agreed to by Curran and Nevels are limited in scope to what is reasonably necessary to protect Plaintiffs' protectable business interests and do not pose an undue hardship on Curran or Nevels.

70. Curran agreed that in the event he breached or threatened to breach the FA Agreement, monetary damages would be inadequate and RJA would be entitled to seek injunctive relief to "to prevent your prospective or continuing breach" of the FA Agreement. (*See* FA Agreement p. 3, **Exhibit 3**).

71. Nevels likewise agreed that upon his breach of the Electronic Confidentiality Agreement Morgan Keegan would "have no adequate remedy at law and will be entitled to obtain injunctive relief to prohibit a violation by the undersigned of any aspect of this Agreement For Use of Electronic Technology." (*See* Electronic Confidentiality Agreement, p. 2, **Exhibit 4.**)

72. Plaintiffs have suffered damages as a result of Nevels' and Curran's breaches of the contractual obligations discussed herein, including, but not limited to, the loss of customer goodwill, the loss of customer relationships, harm to its competitive market position, and other harm.

73. Plaintiffs have suffered, and will continue to suffer, irreparable harm as a result of Nevels' and Curran's breaches of their contractual obligations until such time that they, and others acting in concert with them, including Piper, are ordered to cease such actions and return all confidential and proprietary information to RJA. Injunctive relief is necessary as money damages are difficult to calculate and would not fully compensate RJA for Nevels' and Curran's breaches of their contractual obligations.

74. Accordingly, Plaintiffs are entitled to an injunction as well as damages and attorneys' fees pursuant to the mandatory attorneys' fee provision in Curran's FA Agreement which states,

> In the event of your breach of any of the provisions of this Agreement or of any other provision of your employment relationship with Raymond James [ ] , and in addition to paying the damages arising therefrom, you shall pay any and all costs, expenses, and fees (including attorney's fees, whether incurred by Raymond James [ ] by utilization of inside counsel or outside counsel).

(*See* FA Agreement at p. 3, **Exhibit 3**).

### Count II—Common Law and Statutory Inducement Breach of Contract against Piper for inducing Curran's and Nevels' breach of contract.

75. Plaintiffs hereby incorporate by reference all the allegations set forth in the preceding paragraphs of this Complaint as if fully restated herein.

76. Tennessee law recognizes both a common law cause of action for inducing a breach of contract as well as a statutory cause of action for same under T.C.A. § 47-50-109.

77. Curran has breached and remains in breach of the Confidentiality/Proprietary Information Restrictions in his FA Agreement. He has also breached his Non-Compete Restriction and upon information and belief he has breached and continues to breach his Client No Contact Solicitation/Acceptance Restrictions and Employee Solicitation Restrictions.

78. Under his FA Agreement, Curran cannot do indirectly what he is prohibited from doing directly. As his partner, Nevels is thus likewise bound by Curran's FA Agreement. As alleged above, he has violated and continues to violate the same restrictive covenants as Curran. In addition, Nevels is separately in violation of his own covenants contained in the Electronic Confidentiality Agreement while both have breached the Handbook Confidentiality Restrictions.

79. At all material times including the very date that it hired them, Piper has been aware of the contractual obligations Nevels and Curran owed to Plaintiffs and upon information and belief their intention to operate, and actual operation as joint venturers or partners. Piper by its actions has even conceded its knowledge of Curran's FA Agreement through its sham "temporary termination" of Curran midway through his 30-day Non-Compete Restriction.

80. Piper has intentionally and maliciously induced, encouraged, supported, allowed, aided, abetted and/or ratified Curran's and Nevels' numerous violations of their contractual obligations, as alleged above, and as will be shown following discovery.

81. Piper caused Curran and Nevels to breach their contracts with Plaintiffs by providing them with the incentive and motivation to take Plaintiffs' confidential, proprietary and/or trade secret information, requiring that Curran and/or Nevels solicit, contact, and/or accept business from Plaintiffs' clients along with the means to do so, and keeping Curran employed and/or actively assisting Piper during the 30 day non-compete period. Moreover, although Piper is in the position to stop their breaches of contract, it has refused to affirm that Curran will abide by all of the restrictions set forth in his No Contact/Solicitation and Acceptance Restrictions and has refused to prohibit Nevels from accomplishing indirectly the solicitations, contacts, and acceptance of business from their shared clients that Curran is directly prohibited from undertaking.

82. Plaintiffs have suffered, and will continue to suffer, irreparable harm as a result of the above described inducements until such time as Piper, and others acting in concert with it (e.g., Nevels and Curran), are ordered to cease such actions. Such irreparable harm includes, but is not limited to, the loss of goodwill, the loss of customer relationships, harm to its competitive market position, and other harm.

83. Additionally, Plaintiffs are also entitled to mandatory treble damages pursuant to T.C.A. § 47-50-109.

**Count III—Misappropriation Of Trade Secrets Under The Defend Trade Secrets Act, 18 U.S.C. § 1831 et seq against and Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701 Nevels, Curran, and Piper.**

84. RJA hereby incorporates by reference the allegations set forth in the preceding sections of this Complaint as if fully restated herein.

85. The Defend Trade Secret Act ("DTSA"), 18 U.S.C. § 1836(b)(1) provides civil and criminal remedies for the conversion/misappropriation of trades secrets. Nevels', Curran's, and Piper's misappropriation of RJA's trade secrets discussed herein constitute violations of the Defend Trade Secret Act, 18 U.S.C. § 1836(b)(1).

86. The Tennessee Uniform Trade Secrets Act ("TUTSA"), T.C.A. § 47-25-1701 et. seq., provides civil remedies for the misappropriation of trade secrets under Tennessee law. Nevels', Curran's, and Piper's misappropriation of RJA's trade secrets discussed herein constitute violations of the TUTSA, T.C.A. § 47-25-1701 et. seq.

87. The elements of a claim under both DTSA and TUTSA are largely the same and can be analyzed together under both statutory schemes for both claims.

88. RJA is the owner of valuable trade secrets related to services and/or products used in, or intended for use in, interstate commerce, including financial and/or business information defined as a trade secret under both 18 U.S.C. § 1839(3) and T.C.A. § 47-25-1702(4).

89. RJA's trade secrets are not generally known or readily ascertainable by proper means, and RJA derives a significant economic and competitive advantage in the institutional fixed income and securities business by maintaining the security and confidentiality of its trade secrets.

90. The trade secrets removed by Curran and Nevels discussed herein include, but are not limited to, compilations of financial and business information, business plans, client lists, client account information, client trading history, financial services offerings, trading strategies, and

others based on and/or created by use of RJA's confidential and proprietary information.

91. Curran and Nevels have used and will continue to use the trade secrets belonging to RJA described herein (and those further identified during discovery) for the unauthorized purpose of competing with RJA and diverting RJA's business to Piper.

92. Nevels' and Curran's removal and/or use of RJA's trade secrets occurred while they were acting as agents for Piper, for the benefit of Piper, and/or within the scope of their employment with Piper. Piper is thus liable to RJA for Nevels' and Curran's violations of the DTSA and the TUTSA under principles of respondeat superior and/or agency.

93. Piper is also directly liable to RJA for its own violations of the DTSA and the TUTSA because, upon information and belief, through its agents and employees, Piper has ingested into its systems, disseminated among its employees, or otherwise improperly used and will continue to improperly use RJA's trade secrets taken by Nevels and Curran for the unauthorized purpose of competing with RJA in interstate commerce through Piper and diverting RJA's business to Piper.

94. As a direct and proximate result of the Defendants' ongoing misappropriation of RJA's trade secrets, RJA has suffered and will continue to suffer irreparable injury for which RJA lacks an adequate remedy at law, including but not limited to, loss of information, loss of secrecy of the information, lost business opportunities, and lost clients. Accordingly, RJA is entitled to an injunction as well as statutory damages, exemplary damages, and attorneys' fees.

### Count V—Breach of Duty of Loyalty/Fiduciary Duty against Curran and Nevels

95. RJA hereby incorporates by reference the allegations set forth in the preceding sections of this Complaint as if fully restated herein.

96. While they were employees of RJA, Nevels and Curran owed RJA a common law duty of loyalty and/or fiduciary duty which required that they at all times, *inter alia*, act in RJA's best interests, not engage in conduct adverse to RJA's interests, and refrain from competing with RJA while still employed therewith.

97. In violation of their common law duties to RJA, Curran and Nevels committed the disloyal acts described herein, including, sabotaging client information in RJA's client relationship management platform, fraudulently passing off to RJA expenses they incurred while meeting with Piper in New York as legitimate business expenses, failing to devote their full attention to RJA during business hours—instead working on their recruitment to Piper, misusing RJA resources to further their recruitment to Piper, and withholding trades and/or services from RJA's clients so that said trades/services could be offered at Piper. These and other acts were apparent efforts to directly compete against RJA while Nevels and Curran were still employed therewith.

98. RJA has suffered damages as a direct and proximate result of the unlawful conduct described herein and to be developed during discovery.

99. RJA is entitled to a judgment of monetary damages against Nevels and Curran, including the return of all monies they received from RJA while in breach of the duty of loyalty/fiduciary duty and punitive damages against Nevels and Curran because they acted willfully and intentionally in breaching their duty of loyalty/fiduciary duty to RJA.

100.             Nevels' and Curran's breach of their duties of loyalty/fiduciary duties occurred while they were acting as agents, for the benefit of Piper, and/or within the scope of their employment with Piper. Piper is thus liable to RJA for Nevels' and Curran's breaches of loyalty/fiduciary duty under principles of respondeat superior and/or agency.

**Count VI—Inducing the Breach of Nevels' and Curran's Duty of Loyalty and Fiduciary Duty against Piper.**

101.         RJA hereby incorporates by reference the allegations set forth in the preceding sections of this Complaint as if fully restated herein.

102.     Piper was at all times aware of Nevels' and Curran's employment relationship with RJA.

103.     Piper knew that under Tennessee common law, Nevels and Curran each owed RJA a duty of loyalty/fiduciary duty, were in position of trust/confidence with RJA, and had access to RJA's confidential and proprietary information.

104.     Piper induced Nevels and/or Curran to commit the breaches of loyalty/fiduciary duty described herein.

105.     Piper knew, or should have known, that Nevels' and Curran's conduct described herein constituted a breach of their duty of loyalty/fiduciary duty to RJA.

106.     RJA has suffered damages as a direct and proximate result of the above-described unlawful aiding/abetting and inducement.

107.     RJA is entitled to a judgment of monetary damages against Piper as a result of its unlawful inducement of Nevels and Curran.

108.     RJA is also entitled to punitive damages against Piper because it acted willfully and intentionally in inducing Nevels and Curran to breach their duties of loyalty/fiduciary duties to RJA.

**Count VII—Intentional Interference with Business Relationships ("IIBR") against all Defendants for interfering with RJA's relationship with current/prospective clients and employees.**

109.     RJA hereby incorporates by reference the allegations set forth in the preceding sections of

44

this Complaint as if fully restated herein.

110.    RJA has developed and maintained business relationships with a number of specific banks and credit unions and has prospective business relationships with other small to midsize banks and credit unions.

111.    RJA has developed and maintains specific business relationships with its employees.

112.    Nevels, Curran, and Piper were at all relevant times aware of RJA's existing and prospective business relationships with its clients and its employees.

113.    Nevels, Curran, and Piper have knowingly and intentionally interfered and will continue to interfere with RJA's existing and prospective client relationships by intentionally, knowingly, and/or maliciously using improper means described herein and to be developed during discovery including Curran's and Nevels' breach of their duty of loyalty to RJA and Piper's inducement thereof, undertaking efforts to divert RJA's client relationships while Nevels and Curran were still employees of RJA, violating the No Contact/Solicitation and Acceptance Restrictions in Curran's FA Agreement, and  other methods that violate established industry standards/rules in the securities industry or otherwise involve unethical conduct.

114.    Nevels, Curran, and Piper have knowingly and intentionally interfered and will continue to interfere with RJA's existing and prospective employee relationships by intentionally, knowingly, and/or maliciously using improper means described herein and to be developed during discovery, including Curran's and Nevels' breach of their duty of loyalty to RJA and Piper's inducement thereof, Curran's and Nevels' violation of Curran's Employee Solicitation Restrictions in Curran's FA Agreement, and  other methods that violate established industry standards/rules in the securities industry or otherwise involve unethical conduct.

115.    Piper's, Curran's, and Nevels' improper interference with RJA's existing and prospective client relationships has already caused current and prospective clients to cease and/or refrain from doing business with RJA.

116.    Piper's, Curran's, and Nevels' improper interference with RJA's employment relationships have caused RJA's employees to terminate their employment relationship with RJA.

117.    To the extent that Piper is not directly liable to RJA under this count, it is nonetheless liable to RJA under principles of respondeat superior/agency since Nevels' and Curran's acts occurred while they were acting as agents of Piper, for the benefit of Piper, and/or within the scope of their employment with Piper.

118.    RJA has suffered, and will continue to suffer, irreparable harm as a result of Defendants' improper interference until such time that Defendants and others acting in concert with them are ordered to cease such actions. Such irreparable harm includes, but is not limited to, the loss of goodwill, the loss of customer relationships, harm to RJA's competitive market position, and other incalculable harm.

119.    RJA has also suffered monetary and other non-monetary damages as a direct and proximate result of this tortious interference with its existing and prospective business relationships by Nevels, Curran, and Piper.

120.    RJA is also entitled to punitive damages against Nevels, Curran, and Piper because they acted intentionally and maliciously to interfere with RJA's existing and prospective business relationships.

### Count IX—Unfair Competition against all Defendants

121.    RJA hereby incorporates by reference the allegations set forth in the preceding sections of

this Complaint as if fully restated herein.

122.    Piper, Curran, and Nevels have engaged in the tortious conduct described herein including, *inter alia*, Curran and Nevels breaching their duty of loyalty to RJA which was induced and encouraged by Piper; Piper's inducement of Curran's and Nevels' breaches of their contracts with RJA; and the Intentional Interference with Business Relations committed by all Defendants.

123.    Nevels, Curran, and Piper knew that their conduct was unlawful.

124.    To the extent that Piper is not directly liable to RJA for its own unfair competition, it is nonetheless liable to RJA under principles of respondeat superior/agency since Nevels' and Curran's acts occurred while they were acting as agents of or for the benefit of Piper, and/or within the scope of their employment with Piper.

125.    Piper's, Curran's, and Nevels' tortious conduct described herein and to be uncovered during discovery has deprived RJA of business from current and prospective clients.

126.    RJA has suffered, and will continue to suffer, irreparable harm as a result of Defendants' unfair competition until such time that Defendants and others acting in concert with them are ordered to cease such actions. Such irreparable harm includes, but is not limited to, the loss of goodwill, the loss of customer relationships, harm to RJA's competitive market position, and other incalculable harm.

127.    RJA has also suffered monetary and other non-monetary damages as a direct and proximate result of Defendants' unfair competition.

128.    RJA is also entitled to punitive damages against Nevels, Curran, and Piper because they acted intentionally and maliciously to unfairly compete with RJA.

## Count X—Civil Conspiracy against all Defendants

129.    RJA hereby incorporates by reference the allegations set forth in the preceding sections of this Complaint as if fully restated herein.

130.    Defendants intentionally sought to use unlawful means to compete against Raymond James and knew of each other's intent to do so.

131.    Defendants have acted in concert to compete against RJA by the unlawful means described herein, including working together to circumvent the restrictive covenants in Nevels' and Curran's contracts with RJA, Nevels' and Curran's various breaches of their common law duties of loyalty to RJA, which Piper induced, and Defendants' intentional interference with RJA's business relationships with its clients and employees.

132.    The overt acts in furtherance of this conspiracy include Curran's and Nevels' contact, solicitation, and/or acceptance of business from existing and prospective RJA clients and Piper's inducement and aiding thereof through providing resources and monetary motivation, Curran's and Nevels' sabotage of RJA's client relationship management systems and Piper's inducement thereof,  and  the Defendants' coordinated efforts to allow Nevels and Curran to otherwise improperly compete against RJA while they were still employed therewith as with the case of Curran.

133.    As a direct and proximate result of the Defendants' conspiracy to use unlawful means to compete, RJA has suffered and will continue to suffer irreparable injury for which RJA lacks an adequate remedy at law, including but not limited to, loss of information, loss of secrecy of the information, loss of the ability to fairly compete, lost business opportunities, and lost customers. Accordingly, RJA is entitled to an injunction as well as compensatory and exemplary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, in addition to the relief described above, respectfully pray for the following immediate relief against the Defendants:

1. Entry of a temporary restraining order and, after expedited discovery, a preliminary injunction, as appropriate, pursuant to Fed. R. Civ. P. 65 against all Defendants and those acting in concert requiring the following:

    (a) The return of all of Plaintiffs' documents and information improperly taken by Nevels, Curran, and/or those persons acting in concert with them, including Piper, and prohibiting any further use of such documents and information;

    (b) The preservation and submission to Plaintiffs' third-party vendor of all potentially relevant electronic evidence, including: (i) forensic images of the electronic devices used by Nevels, Curran, relevant Piper employees and those persons acting in concert with them, such as, tablets, cameras, laptop/desktop computers and personal cell phones, from February 2, 2023 forward; (ii) forensic copies of all documents and information on Piper's systems created from the documents and information improperly taken by Curran and/or Nevels; and (iii) forensic copies of all email/messaging platforms outside of those monitored by Piper.

    (c) The permanent removal by Plaintiffs' third-party vendor of all RJA documents and information improperly taken by Curran and Nevels (or containing information derived therefrom) from any electronic devices used by Curran and Nevels, and any devices that received it, as well as any such documents or information that was ingested into Piper's systems;

    (d)    The enforcement of the post-employment covenants contained within Curran's FA Agreement against Nevels and Curran as well as those acting in either of their behalfs, or in concert with them and enforcement of Nevels' Electronic Confidentiality Agreement against Curran and Nevels as well as all those acting on their behalfs, or in concert with them;

    (e)    The prohibition of any use/exploitation by Defendants of RJA's business opportunities or strategies removed by Curran and/or Nevels, including the BOLI-Bond Strategy and the FOA underwriting techniques; and

    (f)    Setting of a hearing for Preliminary Injunction following a sufficient period for discovery to extend as necessary all of the above relief for the balance of the case and to provide such other additional or different relief to which Plaintiffs may be entitled.

2. Expedited discovery as requested in RJA's contemporaneously filed Motion for Expedited Discovery; and

3. Such other, further, or different relief to which Plaintiffs may be entitled at law or in equity Plaintiffs will be seeking a full recovery of all compensatory damages, punitive damages, attorneys' fees, costs, expenses, all other damages, and any other remedies, including permanent injunctive relief, permissible under the law at a later date via its contemporaneously filed FINRA arbitration.

Respectfully submitted this 11th day of October.

Raymond James & Associates, Inc.,
Raymond James Financial, Inc.,
Morgan Keegan & Co. LLC.


*By Its Attorneys*

**PROSSER, CLAPPER & JOHNSON, PLLC**


 /s/ Niel Prosser

Niel Prosser (BPR No. 11647)
Rob Clapper (BPR No. 34180)
Kyle Johnson (BPR No. 36066)
Alex Bunn (BPR. No. 40490)
5865 Ridgeway Center Parkway, Suite 300
Memphis, TN 38120
T: (901) 820-4433
E:  np@prosserlaw.com
     rclapper@prosserlaw.com
     kjohnson@prosserlaw.com
     abunn@prosserlaw.com